UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,                                    Criminal No. 09-242 (MJD/FLN)

        Plaintiff,

      v.                                                      **REPORT AND**
                                                         **RECOMMENDATION**
**Mahamud Said Omar,**

        Defendant.

_____

John Docherty, Charles J. Kovats and LeeAnn K. Bell, Assistant United States Attorneys, and
William M. Narus, United States Department of Justice, for Plaintiff.
Andrew S. Birrell, Jon M. Hopeman, and Paul C. Dworak for Defendant.

_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on March 21,

2012 on Defendant's Motion to Suppress Search and Seizure Evidence (ECF No. 115), Defendant's

Motion to Suppress Wire Interceptions, Electronic Surveillance, and Other Evidence (ECF No. 116),

Defendant's Motion to Suppress Statements (ECF No. 117), Defendant's Motion for Suppression

of Identification Evidence (ECF No. 119), Defendant's Motion to Dismiss Counts for Multiplicity

(ECF No. 120), Defendant's Motion for Bill of Particulars (ECF No. 121) and Defendant's Motion

for Disclosure of Government Files and Other Information Regarding Informants and/or

Confidential Human Sources Under Attorney General's Guidelines (ECF No. 123).  At the hearing,

the Court received testimony from Mr. Erwin Bervoets, Mr. Fokko Bouwman, Special Agent Kiann

VanDenover, and Lieutenant Timothy Smith. The Government submitted twenty exhibits into

1

evidence, and Defendant submitted 31 exhibits into evidence.[1]

The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons which follow, the Court recommends that Defendants' suppression motions be **DENIED,** with the exception of Defendant's Motion to Suppress Identification Evidence (ECF No. 119) which shall remain under advisement pending a further evidentiary hearing. The Court also recommends that Defendant's Motion to Dismiss Counts for Multiplicity and Motion for Bill of Particulars be **DENIED**. The Court recommends that Defendant's Motion for Disclosure of Confidential Informants be **GRANTED in part** as unopposed, and **DENIED in part**.

## I.   FINDINGS OF FACT

### A.   Request for Assistance Under the Mutual Legal Assistance Treaty

Defendant was indicted in August of 2009. (ECF No. 1.) That same month, the FBI learned that Defendant was seeking asylum in the Netherlands. (Tr. 147.) On September 2, 2009, the United States made a request pursuant to the Mutual Legal Assistance Treaty ("MLAT") between the United States and the Netherlands, asking the government of the Netherlands to locate and arrest Defendant in order that he could be extradited to the United States. (Def. Ex. 5.) Among other things, the MLAT request asked the Netherlands to "conduct electronic surveillance of any telephone numbers or e-mail addresses being used by Omar" and to provide the United States government with "transcripts or tapes derived therefrom." *Id.* at 8. The MLAT request also asked

---

[1]All of the exhibits admitted at the hearing on this matter were admitted under seal pursuant to the Amended Protective Order for Unclassified Discovery issued on January 26, 2012. (ECF No. 99.) The Court has reviewed all of the exhibits admitted at the hearing and sees nothing in the exhibits that requires sealing. The Court recommends that all exhibits admitted at the hearing, Government Exhibits 1-20 and Defendant's Exhibits 1-31, be unsealed.

the government of the Netherlands to "search Omar's laptop(s) and/or PC for evidence related to this investigation immediately following his arrest." *Id.* The request also noted that United States law enforcement authorities planned to travel to the Netherlands in order to participate in the interview of Defendant after his arrest. *Id.* at 8-9.

On November 4, 2009, Assistant United States Attorney ("AUSA") Anders Folk sent a letter to Judith Friedman of the Department of Justice Office of International Affairs, asking that she request that the government of the Netherlands conduct several searches. (Def. Ex. 1.) The Dutch authorities were requested to search: (1) "the location in which Omar is found at the time of his arrest;" (2) "the premises of the residence where Omar is living;" and (3) "anywhere it is reasonable to believe Omar may have stored personal items to include personal effects, documents and any electronic media." *Id.*

**B.      Testimony of Fokko Bouwman**

Fokko Bouwman, a commanding police officer in the Netherlands National Crime Squad, was the lead law enforcement officer on the team charged with locating and arresting Defendant in accordance with the MLAT request from the United.

Mr. Bouwman testified regarding the procedures for obtaining arrest, search, and wiretap warrants in the Netherlands. Mr. Bouwman testified that in order for him to arrest someone, unless he has seen a crime committed in his presence, he must obtain a Dutch arrest warrant from the public prosecutor. (Tr. 99-100, 105.) Mr. Bouwman further testified that if he wishes to use a wiretap, he must discuss it with the public prosecutor, who must then obtain permission from an investigating judge. (Tr. 100-101.) Mr. Bouwman testified that the investigating judge is independent and authorizes any "special means" utilized during an investigation. (Tr. 100.) If police wish to conduct

a premises search, they must obtain a search warrant from the public prosecutor, and the prosecutor must obtain permission from the investigating judge.  (Tr. 100.)  When the police conduct a search, the investigating judge is required to be present during the search.  (Tr. 102.)  The investigating judge is the individual who formally seizes any items found during the search.  *Id.*  Police officers bring to the judge any item they wish to seize, and the investigating judge must approve the seizure of each item.  *Id.*

Mr. Bouwman testified that he became involved in this case when an international request from the United States to find and arrest Defendant was assigned to his team of the National Crime Squad.  (Tr. 99.)  Mr. Bouwman then decided to tap Defendant's phone in order to locate him.  (Tr. 141-42.)  In order to institute the wiretap, Mr. Bouwman received a warrant from the prosecutor, who had herself obtained permission from an investigating judge.  *Id.*  Mr. Bouwman's team located Defendant at an Asylum Seekers' Center in Dronten, the Netherlands.  (Tr. 106.)  Mr. Bouwman then obtained a Dutch arrest warrant from the prosecutor.  (Tr. 107; Govt. Ex. 7.)  Mr. Bouwman's team also requested that the prosecutor obtain from the investigating judge a search warrant for: the room where Omar was arrested; the room or dwelling where Omar was temporarily residing; and the room where he stored personal property.  (Govt. Ex. 8.)  A Dutch search warrant was issued.  (Tr. 108-109.)

On November 8, 2009, Defendant was arrested by a Dutch "SWAT" team at the Asylum Seeker Center.  (Tr. 109.)  Mr. Bouwman and his investigative team then searched the room in bungalow 94 where Defendant was arrested and bungalow 47, Defendant's normal residence. (Tr. 115, 118.)  The investigating judge was present during the searches and approved the seizure of all items seized.  (Tr. 117, 120-21.)  Dutch police seized a black Samsung telephone from bungalow

4

94 and two SIM cards, various papers, and a Swedish identity card from bungalow 47.  (Govt. Exs. 9-10.)

## C.    Testimony of Kiann VanDenover

Special Agent Kiann VanDenover works for the Minneapolis office of the FBI, and is assigned to the Joint Terrorism Task Force.  (Tr. 144.)  Special Agent VanDenover testified regarding several interviews with Defendant in the Netherlands.  The first interview took place on November 8, 2009, at the central police station in Rotterdam.  (Tr. 151.)  Present in the interview room were Special Agent VanDenover, another FBI agent Patrick Riley, two Dutch investigators, two translators, and Defendant.  *Id.*  Agent Riley read through an FBI advice of rights form line by line for Defendant.  (Tr. 152.)  The times listed on the advice of rights form indicate that ten minutes were spent advising Defendant of his rights.  (Tr. 154; Govt. Ex. 11.)  Defendant then signed the advice of rights form underneath the lines, "I have read this statement of my rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present."  (Govt. Ex. 11.)  Defendant was also informed of his rights under Dutch law.  (Tr. 155.)

When asked on November 8, whether he wanted a lawyer, Defendant "went back and forth," but ultimately said he didn't need a lawyer, that he already had a Dutch lawyer.  (Tr. 155.)  Special Agent VanDenover testified that Defendant stated he was "very willing" to speak with the investigators without a lawyer present.  *Id.*  The interview that day lasted for approximately three hours, with breaks taken for coffee, to use the restroom and for Defendant to smoke.  (Tr. 157.)  Agent VanDenover testified that Defendant appeared alert, was able to focus on the questions asked, and did not complain of being tired.  (Tr. 158.)  She testified that no promises or threats were made to Defendant.  *Id.*  Defendant did state that he felt ill, but when asked follow up questions he "could

not give details about what was ill or hurt." (Tr. 159.)

Defendant was interviewed again the following day, on November 9, 2009, in the same room at the police station in Rotterdam. (Tr. 160.) The advice of rights form was once again explained to Defendant. (Tr. 161.) Special Agent VanDenover testified that Defendant was annoyed and confused as to why they were explaining his rights to him again, after explaining them the day before. (Tr. 161, 163.) Before signing the form, Defendant stated that he wanted to have a lawyer when he saw a Dutch judge the following day. (Tr. 163.) He then wondered aloud whether he should have a lawyer for the interview. *Id.* At that point, a Dutch investigator asked Defendant why he wanted a lawyer that day when he didn't want one the day before. (Tr. 165.) Defendant then said "he was fine and to continue." *Id.* Defendant then asked how long the questioning was going to last, which law enforcement could not definitively answer. *Id.*

AUSA Anders Folk was also in the interview room on November 9. At this point in the interview, he once again discussed the advice of rights form with Defendant and asked if Defendant wanted a lawyer. (Tr. 165-66.) Defendant stated "no, he was fine." (Tr. 166.) AUSA Folk then read through the indictment line by line with Defendant, and Defendant stated that the charges were clear. *Id.* AUSA Folk then went over the advice of rights form with Defendant for the third time that day, at which point Defendant stated that he would proceed to answer questions and signed the form. (Tr. 166-67; Govt. Ex. 12.) The interview then proceeded from approximately 3:30 p.m. to approximately 6:00 p.m. (Tr. 167-68.) Breaks were taken for coffee, to use the restroom, and for Defendant to smoke. (Tr. 168.)

On November 11, 2009, law enforcement sought to interview Defendant at a police station in Hoofdorp. (Tr. 169.) Special Agent VanDenover asked Defendant if he would be willing to

6

speak with law enforcement, and he stated that he hadn't slept in several days and that he did not want to talk with them that day.  *Id.*  Upon hearing this, law enforcement left.  (Tr. 170.)

Law enforcement also conducted a series of interviews with Defendant at Vught prison between May 26 and June 3, 2011.  (Tr. 171.)  Defendant was represented in these interviews by attorney Bart Stapert, who was licensed to practice law in the Netherlands and in the state of Louisiana.  (Tr. 172-73; Govt. Exs. 15-16.)  Prior to the commencement of the Vught interviews, Defendant, his attorney Mr. Stapert, and AUSA John Docherty signed a proffer letter.  (Govt. Ex. 14.)  At the beginning of the first interview, the proffer letter was read aloud to Defendant.  (Tr. 175.)  During the interviews, Defendant was seated on one side of a glass partition, and law enforcement and Defendant's attorney were on the other side of the partition.  (Tr. 182.) Defendant's attorney was present at all times when law enforcement spoke with Defendant.  (Tr. 175-176.)  Breaks were taken from the interviews for lunch, for prayers, and for Defendant to smoke.  (Tr. 176.)  Any time Mr. Stapert indicated that he wished to speak to his client, law enforcement left the room.  (Tr. 176-77.)  Defendant again complained of illness, but Special Agent VanDenover testified that this did not appear to interfere with his ability to understand or respond to questions.  *Id.*  She further testified that on several occasions when Defendant appeared agitated or began to cry, a break was taken.  (Tr. 177-78.)  At the end of every day of interviewing, law enforcement asked Defendant whether they could return the next day to continue the interview, and on every occasion Defendant stated that he wanted to continue.  (Tr. 179-80.)

**D.    Testimony of Tim Smith**

Lieutenant Tim Smith of the Anoka County Sheriff's Office detention staff testified regarding the recording of Defendant's phone calls while he was detained at the Anoka County Jail.

7

Lieutenant Smith testified that all calls made from the jail are recorded, unless they are calls to an attorney.  (Tr. 216.)   Inmates are directed to submit a request to have their attorney's number submitted into the phone system.  *Id.*  Once an attorney's number is entered into the system, calls to that number are not recorded.  *Id.*

During the booking process, inmates are given a "Data Collection Notice," which explains that all calls other than calls an attorney are charged collect call fees, and that telephone calls made on the inmate telephone system are subject to monitoring and recording except calls to an attorney. (Tr. 219.)   The form also explains that it is the inmate's responsibility to provide the name and phone number for his attorney, so the number can be entered into the phone system.  *Id.*  Lieutenant Smith testified that as part of the booking process, a deputy will give an inmate the Data Collection Notice Form, then orally explain that any calls he makes will be recorded and that it is the inmate's responsibility to provide his attorney's phone number if he wishes to have it entered in the system. (Tr. 217, 220.)   The deputy will then give the inmate time to read over the form and ask if he has any questions.  (Tr. 219.)   If the inmate refuses to sign the form, there is a space for the deputy to sign the form and indicate that the inmate refused to sign.

Lieutenant Smith further testified that every inmate in the Anoka County Jail receives a copy of the inmate handbook.  (Tr. 222.)   The handbook explains, in the section on telephones, that calls to attorneys "are not collect and are not subject to monitoring and recording."  (Tr. 223.)   Every inmate must attend an inmate orientation where the facility rules are explained, and can be discussed on a one-on-one basis if necessary.  *Id.*

Lieutenant Smith testified that when an inmate needs to have something translated into a language other than English, detention staff can contact an over-the-phone interpreter through the

use of a language line service.  (Tr. 224.)  Lieutenant Smith testified that this service is used "quite

often" to explain jail procedures or medical needs.  *Id.*  The bill from the language line service for

August 2011, the month Defendant was booked into the Anoka County Jail, shows a charge for one

six minute call with a Somali interpreter.  (Govt. Ex. 19.)  Lieutenant Smith testified that he could

not say whether this charge refers to interpretation performed for Defendant, but when asked

whether there were any other Somali speakers in the facility during August of 2011, he responded,

"Not to my knowledge."  (Tr. 227-28.)  Lieutenant Smith also testified that based on his

conversations with detention staff, he understood Defendant to have "a pretty good grasp of the

English language."  (Tr. 225.)  Finally, Lieutenant Smith testified that Defendant has specific

attorney numbers entered into the jail phone system.  (Tr. 228.)

## II.   CONCLUSIONS OF LAW

### A.   Defendant's motions to suppress evidence derived from electronic surveillance and evidence derived from search and seizure should be denied.

Defendant moves to suppress all electronic surveillance evidence and all evidence obtained

through search and seizure by Dutch law enforcement in the Netherlands.  Defendant argues that all

such evidence was obtained in violation of his Fourth Amendment right to be free from unreasonable

searches and seizures.[2]

### 1.   Existence of a Joint Venture

As a general matter, the Fourth Amendment and the exclusionary rule do not apply to the

acts of foreign officials acting on their own to enforce foreign law, even where the subject of the

---

[2]Defendant does not challenge the wiretaps under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, codified at Title 18, United States Code, Sections 2510-2520, as Title III does not apply outside the United States.  *See United States v. Maturo*, 982 F.2d 57, 60 (2d Cir. 1992); *United States v. Peterson*, 812 F.2d 486, 492 (9th Cir. 1987).

foreign search is an American citizen. *See United States v. Maturo*, 982 F.2d 57, 60 (2d Cir. 1992); *United States v. Barona*, 56 F.3d 1087, 1091 (9th Cir. 1995). There are two "very limited exceptions" to this rule of general admissibility. *Barona*, 56 F.3d at 1091. The first exception occurs if "the circumstances of the foreign search and seizure are so extreme that they shock the judicial conscience." *Id.* Defendant does not contend that the conduct of the Dutch officials rises to a level that would shock the judicial conscience. (Def. Omar's Mem. In Support of Pretrial Motions ("Def. Mem.") at 14.)

The second exception occurs when foreign officials are engaged in a "joint venture" with the United States. A "joint venture" is created when American officials are highly involved in the foreign investigation and searches, or when foreign officials are acting as agents for their American counterparts. *See Barona*, 56 F.3d at 1091; *United States v. Behety*, 32 F.3d 503, 511 (11th Cir. 1994); *United States v. Maturo*, 982 F.2d 57, 61-62 (2d Cir. 1992). The inquiry for determining whether a joint venture has been created is highly fact specific. *See e.g. United States v. Peterson*, 812 F.2d 486, 490 (9th Cir. 1987) (joint venture found when United States agents were involved daily in translating and decoding wiretap interceptions); *United States v. Maturo*, 982 F.2d 57, 61 (2d Cir. 1992) (no joint venture found because Turkish law enforcement initiated wiretaps in furtherance of their own independent investigation).

The United States asked the government of the Netherlands, via the MLAT request, to locate and arrest Defendant in order that he could be extradited to the United States. (Def. Ex. 5.) Among other things, the MLAT request asked the Netherlands to "conduct electronic surveillance of any telephone numbers or e-mail addresses being used by Omar" and to provide the United States government with "transcripts or tapes derived therefrom." *Id.* at 8.

On November 4, 2009, AUSA Folk sent a letter to Judith Friedman of the Department of Justice Office of International Affairs, asking that she request that the government of the Netherlands conduct several searches.  (Def. Ex. 1.)  The Dutch authorities were asked to search: (1) "the location in which Omar is found at the time of his arrest;" (2) "the premises of the residence where Omar is living;" and (3) "anywhere it is reasonable to believe Omar may have stored personal items to include personal effects, documents and any electronic media."  *Id.*  The Dutch search warrant authorizing the searches at the Asylum Seeker Center states that it was obtained "pursuant to an international request for legal assistance received on 04 November 2009" from the American authorities and authorized the search of "the room where Omar was arrested, the room or dwelling where Omar is temporarily residing, the room where he stored personal property."  (Govt. Ex. 8.)

Mr. Bouwman lead the team of Dutch law enforcement charged with locating and arresting Defendant pursuant to the American request for assistance.  Mr. Bouwman testified that he was not aware of any investigation of Defendant by Dutch law enforcement independent of the request for assistance from the United States.  (Tr. 137-38.)  Mr. Bouwman testified that, while it was his independent decision to seek a wiretap of Defendant's phone in order to assist in locating him, his team was seeking to locate Defendant solely based on the request from the United States.  (Tr. 142, 143.)  Mr. Bouwman testified that all of the actions of his team, including  locating and arresting Defendant and conducting searches of his residence, were taken in response to the request from the United States.  (Tr. 137-38.)

The Court finds that because the wiretap and the searches were conducted at the request of the United States, and not as part of any independent investigation by Dutch law enforcement, there was a joint venture between the United States and the Netherlands.  The Fourth Amendment and the

exclusionary rule therefore apply to the wiretap and the searches.

> **2.**      **Defendant is protected by the Fourth Amendment.**

The Government argues that even if there was a joint venture, Defendant is not protected by the Fourth Amendment because he was a non-citizen outside the territory of the United States.  The Supreme Court has held that the Fourth Amendment does not apply to foreign searches of aliens with no voluntary connection to the United States.  *United States v. Verdugo-Urquidez*, 494 U.S. 259, 274-75 (1990).  The Court stated that the phrase "the people" in the Fourth Amendment refers to "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."  *Id.* at 265.  Unlike the defendant in *Verdugo*, who was a Mexican citizen, Defendant is a lawful permanent resident of the United States.  The Court finds that Defendant is one of "the people" protected by the Fourth Amendment from unreasonable searches and seizures.

> **3.**      **The wiretap and searches were reasonable under the Fourth Amendment because they complied with Dutch law.**

Once it has been determined that a foreign search has been conducted as part of a joint venture, and that the defendant is protected by the Fourth Amendment, evidence obtained through the foreign search will be admissible if the search was "reasonable."  In determining reasonableness, courts look to whether or not the searches were conducted in compliance with the law of the country in which they were conducted.  *United States v. Barona*, 56 F.3d 1087, 1091 n.1 (9th Cir. 1995.)

The wiretap in this case complied with Dutch law.  Mr. Bouwman testified that the wiretap was obtained pursuant to a warrant from the public prosecutor and with permission from an investigating judge, in compliance with Dutch law.  (Tr. 141-42.)  The searches at the Asylum Seeker Center were also conducted in conformity with Dutch law.  Mr. Bouwman testified that he

obtained a search warrant from the public prosecutor, who received permission from an investigating judge. (Tr. 108-109.)  In accordance with Dutch law, the investigating judge was also present during the search and individually approved the seizure of every item taken by law enforcement.  (Tr. 117, 120-21.)  Because the wiretap and the searches were conducted in compliance with Dutch law, they were "reasonable" for purposes of the Fourth Amendment.  Evidence obtained as a result of the wiretap and as a result of search and seizure is admissible.

**B.**     **Defendant's motion to suppress statements should be denied.**

Defendant seeks to suppress statements he made during the interviews on November 8 and 9, 2009 at the Rotterdam Police Station ("Rotterdam Interviews") and the interviews between May 26 and June 3, 2011 at Vught Prison ("Vught Interviews").  Defendant argues that all of these statements were involuntary and taken in violation of Defendant's Fifth Amendment right to counsel. Defendant also seeks to suppress all recordings of telephone calls he made while incarcerated at the Anoka County Jail.

**1.**     **Standard for waiver of *Miranda* rights.**

In order for evidence obtained as a result of custodial interrogation to be used against a defendant at trial, the Fifth Amendment requires that law enforcement advise the individual of his constitutional rights and that he make a valid waiver of those rights. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  Before questioning begins, a suspect in custody must be informed of the following: (1) that he has the right to remain silent; (2) that his statements may be used against him in a court of law; (3) that he has the right to an attorney; and (4) that if he cannot afford an attorney, one will be appointed.   *Id.* at 444, 469–70, 478–79.  Law enforcement officials must use either this formulation of the warnings or "other procedures [that] are at least as effective in apprising accused

persons of their right of silence and in assuring a continuous opportunity to exercise it." *Id.* at 467. After the warnings are given, if the suspect indicates that he wishes to assert these rights, the interrogation must stop. *Id.* at 473–74. Statements elicited from a suspect in violation of *Miranda* are inadmissible. *Stansbury v. California*, 511 U.S. 318, 322 (1994).

Once advised of his *Miranda* rights, a suspect's waiver of his Fifth Amendment privilege against self-incrimination is only valid if it is voluntarily, knowingly, and intelligently made. *Miranda*, 384 U.S. at 444; *United States v. Syslo*, 303 F.3d 860, 866 (8th Cir. 2002); *see also Berghuis v. Thompkins,* 130 S. Ct. 2250, 2260 (2010). A waiver is made knowingly if it is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). It is voluntary if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* It is the Government's burden to show that the suspect's waiver meets these standards. *Miranda*, 384 U.S. at 475.

In order to invoke one's Fifth Amendment right to counsel, a suspect must do so unambiguously. *Thompkins*, 130 S. Ct. at 2259-2260 ("If an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights."), citing *Davis v. United States*, 512 U.S. 452, 461–62 (1994).

Similarly, a suspect's invocation of the right to silence must be unambiguous. *See Thompkins*, 130 S. Ct. at 2260 ("Thompkins did not say that he wanted to remain silent or that he did not want to talk with the police. Had he made either of these simple, unambiguous statements, he would have invoked his  right to cut off questioning . . . . Here he did neither, so he did not

invoke his right to remain silent.") (quotation omitted); *United States v. Ferrer-Montoya*, 483 F.3d

565, 569 (8th Cir. 2007) ("Indirect, ambiguous, and equivocal statements or assertions of an intent

to exercise the right to remain silent are not enough to invoke that right for the purposes of

*Miranda.*"). "Where the prosecution shows that a *Miranda* warning was given and that it was

understood by the accused, an accused's uncoerced statement establishes an implied waiver of the

right to remain silent." *Thompkins*, 130 S. Ct. at 2261 (citations omitted) ("If the State establishes

that a *Miranda* warning was given and the accused made an uncoerced statement, this showing,

standing alone, is insufficient to demonstrate 'a valid waiver' of *Miranda* rights . . . The prosecution

must make the additional showing that the accused understood these rights.")

### 2.  The Rotterdam Interviews

Defendant argues that his statements during the Rotterdam Interviews were taken in violation

of his Fifth Amendment right to counsel and were involuntary.  The Court finds that Defendant

made a knowing and voluntary waiver of his Fifth Amendment rights before the Rotterdam

Interviews.  On both November 8 and November 9, law enforcement provided *Miranda* warnings

in the form of the FBI advice of rights form.  On both days, Defendant signed the advice of rights

form, indicating that he understood his rights and was willing to answer questions without a lawyer

present.  (Govt. Exs. 11 and 12.)

Defendant argues that Agent VanDenover's testimony that he "went back and forth" about

wanting a lawyer on November 8 and "made comments about talking to a lawyer" on November 9,

indicate that Defendant asserted his right to counsel.  However, the Supreme Court has made clear

that "if the suspect's statement is not an unambiguous or unequivocal request for counsel, the

officers have no obligation to stop questioning him." *Davis v. United States*, 512 U.S. 452, 461-462

15

(1994).  None of Defendant's statements, as described by Agent VanDenover, constituted an unequivocal request for counsel.  When asked whether Defendant had ever said words to the effect of "I want a lawyer," Special Agent VanDenover testified, "No, absolutely not."  (Tr. 163.)

In *Davis*, the Supreme Court stated that when a suspect makes an ambiguous statement, while not required, it is "good police practice for the interviewing officers to clarify whether or not he actually wants an attorney."  *Id.* at 461.  That was the procedure followed by law enforcement in this case.  The evidence shows that law enforcement spent ten minutes discussing Defendant's rights with him on November 8, and twenty two minutes discussing his rights on November 9.  (Govt. Exs. 11 and 12.)  When Defendant wondered aloud whether he should have a lawyer on November 9, AUSA Folk read through the advice of rights form with him line by line for the second time that day.  (Tr. 165-66.)  Defendant stated he did not want a lawyer.  AUSA Folk then read through the indictment line by line with Defendant, to ensure that the charges were clear.  *Id.* Finally, AUSA Folk read through the advice of rights form for the third time, at which point Defendant stated he would proceed to answer questions and signed the form.  (Tr. 166-67.)  Law enforcement scrupulously complied with the requirements of the Fifth Amendment, and Defendant waived his rights under the Fifth Amendment.

Defendant also argues that the statements were not voluntary because he was ill at the time of the interview.  Defendant points to his statement to law enforcement during the November 8 interview that "he had been sick in his head and his body since he came to Holland."  (Tr. 195-96.) Defendant argues that his illness, combined with the fact that he had been arrested by a SWAT team in the middle of the night twelve hours before, combine to make his statements to law enforcement involuntary.  "A statement is involuntary when it was extracted by threats, violence, or expressed

or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004). This determination is based on the totality of the circumstances, looking to the "conduct of the officers and the characteristics of the accused." *Id.*

There is no evidence in this case of coercive conduct by law enforcement in conjunction with the Rotterdam interviews. Defendant was advised at length of his rights to counsel and to remain silent. Special Agent VanDenover testified that no promises or threats were made to Defendant. (Tr. 158.) Additionally, while Defendant mentioned he was ill, he could not elaborate on the nature of his illness, and did not show any outward signs of illness. (Tr. 158-59.) Defendant appeared alert and was able to focus on the questions asked. The Court finds that Defendant's statements in the Rotterdam interviews were not involuntary, and that he voluntarily waived his Fifth Amendment right to counsel.

### 3.     The Vught Interviews

Defendant argues that the Vught Interviews were involuntary. Defendant relies primarily on an affidavit by his Dutch attorney, Bart Stapert, wherein Mr. Stapert states that the conditions where Defendant was housed at Vught prison are the harshest in the Dutch penitentiary system and effectively amount to solitary confinement. (Def. Ex. 14.) Mr. Stapert states that these conditions had a severe impact on Defendant, and caused his mental state to fluctuate tremendously. *Id.*

The Court finds that Defendant's statements in the Vught interviews were voluntary. Defendant was represented by competent counsel, Mr. Stappert, who was licensed to practice law in both the United States and the Netherlands. Defendant and his lawyer met with the Government under the terms of a proffer letter. (Govt. Ex. 14.) Defendant's counsel was present at all times

when law enforcement spoke with Defendant.  At the beginning of the first interview, the proffer

letter was read to Defendant verbatim by an AUSA.  At the end of every day of interviewing except

the last, Defendant was asked whether he wished to continue the interview the next day, and

Defendant answered that he did wish to continue.  (Tr. 179-80.)  No threats were made to Defendant

in conjunction with the Vught interviews, and no promises were made to Defendant other that what

was contained in the proffer letter.  (Tr. 177.)  Breaks were taken every day for lunch, for prayers,

for Defendant to speak privately with his attorney, and for Defendant to smoke.  (Tr. 176-77.)

Finally, the only evidence relied on by Defendant as evidence of his mental state at the time

of the interviews is provided by his Dutch counsel, Bart Stapert.  However, Mr. Stapert was present

during the interviews, signed the proffer letter, and never indicated at the time of the interviews that

his client was unable to proceed due to his mental state.

The Court finds that Defendant was represented by competent counsel, that Defendant

waived his Fifth Amendment rights, and that Defendant's statements were not involuntary.

Defendants statements from the Vught interviews are admissible.

### 4.    Jail Calls

Defendant seeks to suppress recordings of his telephone calls made from the Anoka County

Jail.  Under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, telephone calls

may be intercepted without a warrant if one of the parties to the call gives prior consent.  18 U.S.C.

§ 2511(2)(c).  Inmates are considered to have impliedly consented to the recording of their calls

from a correctional facility if they knew the calls were being monitored and recorded but continued

with them anyway.  *United States v. Lucas*, 499 F.3d 769, 780 (8th Cir. 2007).  Defendant argues

that the government has failed to produce sufficient evidence that he was aware of the Anoka

County Jail's policy to record inmate phone calls, as Defendant is a Somali immigrant who requires the use of a Somali interpreter.

The Government provided evidence, in the form of the testimony of Lieutenant Tim Smith, of the Anoka County Sheriff's office, regarding dissemination of the jail's phone recording policy.[3] Lieutenant Smith testified that during the initial booking process, inmates are given a form that advises them that "all your telephone calls made on the inmate telephone system are subject to monitoring and recording except calls to your attorney." (Tr. 219.) The form also advises inmates that it is their responsibility to provide the name and phone number of their attorney, so that the attorney's phone number may be entered into the phone system to prevent the recording of those phone calls. *Id.* Lieutenant Smith testified that this phone policy is also verbally explained to inmates during the booking process. (Tr. 217-19.) Lieutenant Smith also testified that the phone policy is contained in the inmate handbook, a copy of which is provided to each inmate in the jail. (Tr. 222-23.)

Lieutenant Smith also testified that the jail is contracted with a language line service, which provides over-the-phone interpretation for inmates who do not speak English. (Tr. 224.) Lieutenant Smith testified that he had no personal knowledge of how the jail's telephone policies were conveyed to Defendant, but that he would assume that "[i]f he seemed to not understand what he was being asked, then we would have contacted the interpretation, the language line service." (Tr. 226.) Lieutenant Smith also testified that Defendant has specific attorney numbers programmed in the jail

---

[3]Defendant argues that the Government failed to offer for admission Government Exhibits 17-19, upon which the Government relies in support of the admissibility of the jail call recordings. Assuming, without deciding, that these exhibits have not been admitted, the Court decides the motion without reference to these exhibits.

telephone system.  (Tr. 228.)

Based on the evidence of the notice given to inmates of the jail's recording policy, and on the evidence that Defendant himself has attorney phone numbers programmed into the jail telephone system, the Government has established a prima facie case that Defendant was aware of the jail's recording policy.  Defendant has not produced any evidence to show that he was not aware of the policy.  The Court finds that Defendant's recorded jail phone calls are admissible.

**C.    The indictment is not multiplicitous.**

Defendant moves to dismiss the indictment for multiplicity, arguing that no one count of the five counts contained in the indictment requires proof of a fact that the other counts do not require. The rule for determining whether multiple counts in an indictment are multiplicitous was articulated by the Supreme Court in *Blockburger v. United States*, 284 U.S. 299 (1932).  Under *Blockburger*, "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two different offenses or only one, is whether each provision requires proof of a fact which the other does not."  *Id.* at 304.

Defendant is charged with the following five counts: (1) Conspiracy to Provide Material Support to a Conspiracy to Kill Abroad, in violation of Title 18, United States Code, Section 2339A; (2) Providing Material Support to a Conspiracy to Kill Abroad, in violation of Title 18, United States Code, Section 2339A; (3) Conspiracy to Provide Material Support to a Foreign Terrorist Organization, in violation of Title 18, United States Code, Section 2339B; (4) Providing Material Support to a Foreign Terrorist Organization, in violation of Title 18, United States Code, Section 2339B; and (5) Conspiracy to Kill, Kidnap, Maim and Injure Persons Outside the United States, in violation of Title 18, United States Code, Section 956(a).  (ECF No. 1.)

20

To the extent Defendant argues that counts alleging substantive offenses are multiplicitous with counts alleging conspiracy to commit those substantive offenses, Defendant's argument fails. The Supreme Court has held it to be a settled principle that "the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses." *Callanan v. United States*, 364 U.S. 587, 593 (1961).  Counts 2 and 4, alleging the substantive offenses of Providing Material Support to a Conspiracy to Kill Abroad and Providing Material Support to a Foreign Terrorist Organization respectively, are not multiplicitous with Counts 1 and 3, which allege a conspiracy to commit those substantive offenses.

Defendant's argument also fails to the extent he argues that counts alleging violations of Section 2339A (Counts 1 and 2), are multiplicitous with counts alleging violations of Section 2339B (Counts 3 and 4).  Section 2339A requires proof that Defendant provided material support that he knew or intended would be used in preparation for, or in carrying out, a violation of 18 U.S.C. § 956, which prohibits conspiracies to injure persons outside the United States.[4]  Section 2339B requires proof that Defendant provided material support to an organization designated as a foreign terrorist organization.[5]  *See United States v. Chandia*, 514 F.3d 365, 372 (4th Cir. 2008) (holding Congress intended to allow multiple punishments for a single course of conduct that violated Section 2339A

---

[4]"Whoever provides material support or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of. . .[Title 18, United States Code, Section] 956 . . . shall be [punished]."  18 U.S.C. § 2339A.

[5]"Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be [punished]. . . . To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization . . ., that the organization has engaged or engages in terrorist activity . . ., or that the organization has engaged or engages in terrorism . . . ."  18 U.S.C. § 2339B.

and Section 2339B).  Because each statute requires proof of an element the other does not, alleged violations of Section 2339A and alleged violations of Section 2339B are not multiplicitous.

Finally, Defendant's argument fails to the extent he alleges that Counts 1 and 5 are multiplicitous because they involve the same conspiracy.  Count 5 alleges that Defendant conspired to kill, kidnap, maim or injure persons outside the United States, in violation of 18, United States Code, Section 956.  Count 1 alleges that Defendant conspired to provide material support to a Section 956 conspiracy.  Each of these conspiracies requires proof of a fact the other does not.  Count 1 does not require an agreement to kidnap, murder, or maim, while Count 5 does not require an agreement to provide material support.

The fact that Count 1 alleges a conspiracy as the predicate for another conspiracy is not novel or improper.  "Courts have recognized that one conspiracy can serve as the predicate for another conspiracy when the '[overarching] conspiracy and the predicate conspiracy are distinct offenses with entirely different objectives.'" *United States v. Khan*, 461 F.3d 477, 493 (4th Cir. 2006) (citations omitted).  In this case, the statute under which Defendant is charged in Count 1, Section 2339A, expressly allows one conspiracy to serve as the predicate offense for another conspiracy.  Section 2339A criminalizes providing material support, or *conspiring* to provide material support, to be used in preparation for or carrying out of various predicate offenses, including Section 956, which is defined as a conspiracy to kill, kidnap, maim or injure.  18 U.S.C. § 2339A.  Counts 1 and 5 are not multiplicitous.

The Court finds that all of the counts charged in the indictment require proof of at least one fact not required by the other counts.  The indictment is not multiplicitous and should not be dismissed.

**D.      Defendant's motion for a bill of particulars should be denied.**

Defendant's motion for bill of particulars is closely connected to his motion to dismiss for multiplicity.  Defendant argues that he cannot determine whether the indictment is multiplicitous without a bill of particulars, however the Court has already determined, based on the nature of the charged offenses, that the indictment is not multiplicitous.  Defendant further argues that he needs a bill of particulars to provide the following facts, which he cannot discern from the indictment: who his co-conspirators were; what facts support each conspiracy count;  what financial support and personnel Defendant is alleged to have provided in Counts 1-4; and what terrorist activity was engaged in by al-Shabaab as alleged in Counts 3 and 4.

"The purpose of a bill of particulars is to inform the defendant of the nature of a charge with sufficient precision to enable him to prepare for trial and to avoid or minimize the danger of surprise at trial."  *United States v. Huggans*, 650 F.3d 1210, 1220 (8th Cir. 2011).  "A bill of particulars is not a discovery device to be used to require the government to provide a detailed disclosure of the evidence that it will present at trial."  *Id.*

The Government argues that the indictment in this case is sufficient because it tracks the statutory language of the charging statute, specifies a beginning date for every conspiracy or substantive crime, and lists nine individuals, by name, whose travel to Somalia is alleged to be an overt act in furtherance of the conspiracy alleged in Count 5.  Further, the government argues that it has already provided Defendant with considerable discovery, which includes much of the information Defendant seeks.  The government asserts that it has provided, in detention hearing proffers and extradition-related affidavits, a detailed roadmap to its case.  The Court finds that the indictment, in combination with the discovery already provided by the Government, serves to inform

Defendant of the nature of the charges against him with sufficient precision to enable him to prepare for trial. Defendants motion for bill of particulars should be denied.

### E.      Motion for Disclosure of Confidential Informants

Defendant moves for the disclosure of the identities of confidential informants. The Government asserts that it has no informants whose identity it will seek to keep confidential indefinitely. (Mem. of Law and Fact by the United States Regarding *Rovario* Issue and Identification Evidence ("Govt. *Rovario* Mem.") at 1, ECF No. 152.) The Government states that it will disclose the identities of all witnesses that are currently confidential 14 days in advance of trial, the date it has agreed to make its Jencks disclosures. *Id.* at 3. The Court recommends that this motion be granted as unopposed to the extend Defendant seeks the identity of confidential informants. The Government shall produce the informants in its office for interview by counsel no later than 14 days in advance of trial.

Defendant also moves for disclosure of "[w]hether law enforcement officials followed the Attorney General's Guidelines Regarding the Use of FBI Confidential Human Sources in assessing, engaging, and monitoring said individuals." (Def. Mot. For Disclosure of Govt. Informants at 1, ECF No. 123.) The Court finds that the Attorney General's Guidelines do not create an obligation of disclosure, therefore to the extent the motion seeks information beyond the identities of confidential informants and the opportunity to interview confidential informants, the motion should be denied.

### F.      Motion to Suppress Identification Evidence

Defendant has moved to suppress all out-of-court and potential future in-court identifications made by CW2 and CW3. The Government has asserted that it does not intend to introduce any out-

of-court identifications at trial.  (Govt. *Rovario* Mem. at 5.)  The Government further argues that because it has not yet made a final determination regarding its witnesses at trial, the issue of in-court identifications is not yet ripe.  Any in-court identifications will be admissible only if they are not the product of an unduly suggestive out-of-court identification.  *See Simmons v. United States*, 390 U.S. 377, 384 (1968).  The Court finds that it is appropriate to hold a hearing regarding the reliability of out-of-court identification procedures, as any later argument regarding in-court identification will turn on whether such identification was tainted by an earlier out-of-court identification.

The Government further argues that the way in which photograph identifications were used in the FBI's investigation of this case diminishes the likelihood of misidentification.  The Government states that many of the people in this investigation are known by a true name and by one or more nicknames.  The investigating agents in this case would often show a witness a single photograph in order to ensure that the agent and witness were discussing the same person.  (Govt. *Rovario* Mem. at 4-5.)

Identification procedures are most likely to lead to misidentification in cases in which a crime victim is asked to identify a stranger with whom he had only limited interaction during an emotionally stressful event.  *See, e.g. Neil v. Biggers*, 409 U.S. 188, 195 (1972) (victim identified defendant as her rapist at a one-person show-up seven months after she had been assaulted); *Stovall v. Denno*, 388 U.S. 293, 295 (1967) (one person show-up of murder suspect to hospitalized widow of murder victim).  The reliability of a single-photograph identification is greatly increased when there is a pre-existing relationship between the witness making the identification and the defendant being identified.  *See, e.g. United States v. Castro*, 243 F.Supp 565, 570-571 (W.D. Va. 2003)

(single-photograph identification of a business associate).  The identification procedures used in this case, as described by the government, appear to fall somewhere in the middle on this continuum. The Court concludes that an evidentiary hearing regarding the out-of-court identifications is necessary in order to evaluate the identifications based on the factors identified in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).  The parties shall appear for a hearing before the undersigned on May 8, 2012 at 10:30 a.m.

## III.    RECOMMENDATION

Based upon the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Defendant's  Motion to Suppress Search and Seizure Evidence (ECF No. 115) be **DENIED**;

2.    Defendant's Motion to Suppress Wire Interceptions, Electronic Surveillance, and Other Evidence (ECF No. 116) be **DENIED**;

3.    Defendant's Motion to Suppress Statements (ECF No. 117) be **DENIED**;

4.     Defendant's Motion to Dismiss Counts for Multiplicity (ECF No. 120) be **DENIED**;

5.    Defendant's Motion for Bill of Particulars (ECF No. 121) be **DENIED**; and

6.    Defendant's Motion for Disclosure of Government Files and Other Information Regarding Informants and/or Confidential Human Sources Under Attorney General's Guidelines (ECF No. 123) be **GRANTED in part**, and **DENIED in part**.  The motion should be **GRANTED** to the extent it seeks the identities of confidential informants.  The Government shall make the informants available in their office for interview at least 14 days before trial in this matter.  The motion should be **DENIED** to the extent it seeks disclosure of evidence regarding whether law enforcement followed the Attorney General's Guidelines Regarding the Use of FBI Confidential Human Sources.

7.    Defendant's Motion for Suppression of Identification Evidence (ECF No. 119) shall remain under advisement pending an evidentiary hearing on May 8, 2012, at 10:30

a.m., before the undersigned in 9W, United States Courthouse, 300 South 4th Street, Minneapolis, Minnesota.


DATED: May 1, 2012                    *s/ Franklin L. Noel*
                                      FRANKLIN L. NOEL
                                      United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **May 15, 2012**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **May 15, 2012,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.