UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Criminal No. 09-242 (MJD/FLN) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| **Mahamud Said Omar,** | |
| Defendant. | |

John Docherty, Charles J. Kovats and LeeAnn K. Bell, Assistant United States Attorneys, and William M. Narus, United States Department of Justice, for Plaintiff.
Andrew S. Birrell, Jon M. Hopeman and Paul Dworak for Defendant.

**THIS MATTER** came before the undersigned United States Magistrate Judge on May 23, 2012 on Defendant's Motion to Suppress Identification Evidence (ECF No. 119). At the hearing, the Court received testimony from Kiann VanDenover, Patrick Rielly, Scott Zimmerman and Courtney Beard. Defendant submitted two exhibits into evidence. The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons which follow, the Court recommends that Defendant's Motion to Suppress Identification Evidence (ECF No. 119) be **GRANTED**.

## I.   FINDINGS OF FACT

### A.   Background

The Court held a hearing on pretrial motions on March 21, 2012. Defendant moved to suppress single-photograph, show-up identifications by government witnesses. The Government stated that it did not intend to offer any pretrial identifications at trial, but that pretrial identifications

had occurred and that those witnesses would be asked to identify Defendant at trial. The Government took the position that a pretrial hearing on the reliability of identifications was unnecessary, as that issue could be probed on cross-examination at trial. The Court expressed its view that when a defendant challenges pretrial identification procedures, a pretrial hearing is required to allow the Court to determine whether the identification procedures were unduly suggestive and whether the identifications were reliable. The Government stated it was not opposed to a hearing on this issue, but that it was not prepared to offer witnesses that day and asked that the hearing be held on a date closer to trial.

On May 1, 2012, the Court issued a Report and Recommendation on Defendant's pretrial suppression motions. (ECF No. 165.) In that Report and Recommendation, the Court found that it was necessary "to hold a hearing regarding the reliability of out-of-court identification procedures, as any later argument regarding in-court identification will turn on whether such identification was tainted by an earlier out-of-court identification." *Id.* at 25. The Court acknowledged that identification procedures are most likely to lead to misidentification when a crime victim is asked to identify a stranger and are much less likely to lead to misidentification when there is a pre-existing relationship between the witness making the identification and the defendant. The Court noted that the procedures used in this case, based on the description provided by the government, appeared to fall somewhere in the middle on that continuum. The Court ordered the parties to appear for an evidentiary hearing regarding the reliability of the identifications on May 8, 2012. *Id.* at 26.

At the hearing on May 8, the Government stated its intention to have the testifying FBI agent refer to the individuals who had identified a photograph of Defendant simply as "Witnesses 1-4"

rather than by name, due to concerns for witness safety. The Government provided a key, which identified the names of Witnesses 1-4, to the Court and to the testifying witness. Defense counsel objected and moved the Court to order the Government to disclose the names of Witnesses 1-4 so that Defendant could call those witnesses to testify regarding their pretrial identifications of Defendant.

The Court allowed the hearing to proceed without use of the real names of the identifying witnesses. After hearing some testimony, the Court continued the hearing until May 23, 2012. The continuance allowed time for the Government to produce redacted copies of FBI 302s from interviews with Witnesses 1-4 and for the parties to brief the issue of whether the Government should be required to disclose the names of the identifying witnesses. In an order dated May 17, 2012, the Court denied Defendant's motion for disclosure of the names of the witnesses to whom Defendant's photograph was displayed. (ECF No. 176.) The Court also denied the Government's request to continue the hearing to a time closer to trial. *Id.*

The Court held a reconvened hearing on May 23, 2012. At that hearing, four FBI agents testified regarding interviews during which they displayed Defendant's photograph to four witnesses. Those witnesses were referred to by number, and not by name.

**B.     Witness One**

FBI Special Agent Patrick Rielly testified that he showed the same photograph of Defendant, identified as Government Exhibit 1, to Witness One on three separate occasions: April 9, 2009; June 7, 2010; and November 15, 2011. During an interview on April 9, 2009, Agent Rielly showed Witness One eighty-five photographs. Tr. 61. He showed Witness One each photograph individually, by placing the photograph on the table and asking, "Do you know this guy?" or, "Do

3

you know this woman?" *Id.* If Witness One responded that he did know the person in the photograph, Agent Rielly would then ask Witness One what he knew about that person. Defendant's photograph was the eighty-third photograph displayed to Witness One. Tr. 63. Witness One identified Defendant as "Sharif" and stated he was "someone he knew from Abubakr As-Saddique Mosque, who later spent time at an Al-Shabaab safe-house in Marka." Tr. 64. The photograph of Defendant remained on the table for "a couple of minutes" while Witness One talked about Sharif. Tr. 71-72.

On June 7, 2009, Agent Rielly showed Witness One twenty-nine photographs. Tr. 65. Once again the photographs were displayed one at a time, and for each photograph Agent Rielly asked, "Do you know this person?" *Id.* Witness One was shown the same photograph of Defendant, and once again identified him as "Sharif." Tr. 66-67. The photograph remained on the table for "two or three minutes" as Witness One discussed Sharif. Tr. 78.

On November 15, 2011, Agent Rielly again interviewed Witness One. During the course of the interview, Witness One began to discuss Sharif. Agent Rielly then displayed Defendant's photograph. Witness One again identified Defendant as "Sharif." In response to a question from the Court, Agent Rielly testified that Witness One stated he had last seen Sharif in 2007, before Witness One went overseas. Tr. 84. The Court asked Agent Rielly whether Witness One had said any more regarding how well he knew Defendant. Tr. 84. The Government objected to the question on the basis of witness safety and the need to conceal the identity of Witness One. Tr. 88-90. After a conference on the record with counsel and Defendant in chambers, the Court sustained the Government's objection.

**C.     Witness Two**

Special Agent Kiann VanDenover testified that she asked Witness Two to identify Defendant's photograph on three occasions: February 25, 2009; March 11, 2009; and May 11, 2009. During the first interview, on February 25, 2009, Agent VanDenover showed Witness Two three photographs. Tr. 21. Each photograph was displayed separately. One of those photographs was Government Exhibit 1, the photograph of Defendant. Agent VanDenover lay down the photograph and asked Witness Two whether he recognized that person and to tell her what he knew about the person. Tr. 22. Agent VanDenover testified that Witness Two identified the individual as "Sharif" with "no hesitation." Tr. 23. Defendant's picture remained on the table for ten minutes while Agent VanDenover and Witness Two discussed Sharif. Tr. 45.

On March 11, 2009, Agent VanDenover again interviewed Witness Two. During the course of the interview, Witness Two mentioned that a man named Sharif who he knew from Abubakr As-Saddique Mosque in Minneapolis arrived at a house in which Witness Two was staying. Tr. 32; Def. Ex. 1 at Bates 6309. At that point, Agent VanDenover lay the photograph of Defendant, which Witness Two had previously identified as "Sharif," on the table. Tr. 32. Witness Two then stated, "Yes, that's Sharif." *Id.* Witness Two went on to state that Sharif was an employee of the mosque, that Witness Two had observed him there often, and that he may also have had a job as a mechanic or truck driver. Tr. 27; Def. Ex. 1 at Bates 6309. Defendant's photograph was on the table for "ten or fifteen minutes" during this interview. Tr. 46.

On May 11, 2009, Agent VanDenover showed Witness Two twenty photographs. Tr. 25. Agent VanDenover used the same procedure she had used on February 25, showing Witness Two each photograph individually and asking, "Do you know this person?" Witness Two again identified Defendant as "Sharif." *Id.* In response to questioning from the Court, Agent VanDenover testified

5

that Witness Two had shared a room with Defendant in Somalia and that Witness Two had last seen Defendant in February or March of 2008. Tr. 55-57.

**D.     Witness Three**

Special Agent Scott Zimmerman interviewed Witness Three on July 18, 2009. Tr. 101. During the interview, Witness Three "discussed an individual named Sharif in great detail." Tr. 101. Agent Zimmerman estimated that they discussed Sharif for at least half an hour. Tr. 105. Witness Three stated that Sharif "was present with him in Somalia." *Id.* The next day, on July 19, 2009, Witness Three was shown 152 photographs of individuals. Tr. 98. These photographs were shown one at a time, and Government Exhibit 1, the photograph of Defendant, was number fifteen in the sequence. Tr. 98. Agent Zimmerman asked, "Do you know this person?" Tr. 98. Witness Three responded that it was Sharif, who he had discussed the previous day. Tr. 101.

**E.     Witness Four**

Special Agent Courtney Beard testified that she interviewed Witness Four and displayed a copy of Defendant's photograph on September 22, 2009. Tr. 113-114. Agent Beard testified that on the prior day they had discussed Sharif for a few minutes, but did not state what specifically was discussed. Tr. 119. On September 22, Agent Beard used the same procedure as the other agents, placing photographs before the witness and asking if the witness recognized the person. Tr. 117. Agent Beard displayed a total of 139 photographs during the interview. Tr. 115. The first 108 photographs were arranged in "six-packs," six-photograph arrays in which only one person was a "person of interest" in the government's investigation. Tr. 126-27. Agent Beard then displayed single photographs, one of which was Government Exhibit 1, the photograph of Defendant. Tr. 116. Witness Four identified the person in the photograph as "Sharif Omar" and stated that this was the

6

same individual Witness Four had spoken about previously in the interview. Tr. 118. Agent Beard testified that Witness Four did not display any outward signs of hesitation when making the identification, and that the photograph remained on the table for "a couple of minutes, at most." *Id.* Agent Beard testified that Witness Four knew the defendant as a janitor at the Abubakr Mosque and that Witness Four last saw the defendant prior to the defendant's travel overseas in 2008. Tr. 125-26.

Counsel for the Government also informed that Court that a photograph of Defendant was displayed while Witness 4 was testifying before the grand jury. Tr. 111. The Government expressed its view that this display was "in the context of testimony, not in the context of an investigative interview." *Id.*

## II. CONCLUSIONS OF LAW

**A.     Photo Identifications**

The Government intends for each of these four witnesses to testify at trial that the person they know as Sharif engaged in certain conduct that the government contends constitutes conspiracy to provide support to a foreign terrorist organization, among other crimes contained in the indictment. The Government also intends for these witnesses to identify Defendant in court at trial as the person they knew as "Sharif." Defendant moves to suppress these in court identifications, arguing that they are tainted by earlier single-photograph show-up identification procedures. Defendant argues that each of the four witnesses had at least one, if not multiple, prior conversations with law enforcement regarding "Sharif," throughout which a single photograph of Defendant was displayed. Defendant argues that these earlier identification procedures were unduly suggestive, and would taint any in-court identification, which must be suppressed. The Government argues in

response: (1) that the procedures used during earlier interviews were not "identification procedures;" (2) that the earlier procedures were not unduly suggestive; and (3) that even if the earlier procedures were unduly suggestive, the identifications are still reliable under the totality of the circumstances. The Court addresses each of these arguments in turn.

### 1. Legal Standard Governing Admissibility of Identification Procedures

In-court identification procedures are inadmissible when they follow pretrial identification procedures that are "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). Courts considering due process challenges to identification procedures use a two-part test. The first inquiry is whether "law enforcement officers use[d] an identification procedure that is both suggestive and unnecessary." *Perry v. New Hampshire*, 132 S.Ct. 716, 724 (2012). If the identification procedure was indeed suggestive and unnecessary, then the second inquiry is whether the identification was reliable under the totality of the circumstances. *Manson v. Brathwaite*, 432 U.S. 98, 106, 114 (1977). The identification will be considered reliable if it does not create a "substantial likelihood of misidentification." *Id.* When determining whether an identification is reliable, the court must consider the factors set out in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972), including: the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the time between the crime and the confrontation.

### 2. The procedures used in this case were "identification procedures."

The Government argues for the third time that the procedures used in this case do not

constitute "identification procedures" subject to the traditional due process analysis outlined in *Simmons* v. *United States*, *Manson v. Brathwaite*, and *Neil v. Biggers*. The Court has repeatedly rejected this argument, and does so again now. When previously rejecting the Government's contention that the facts here did not warrant an evidentiary hearing regarding suppression of identification evidence, the Court summarized the use of identification procedures in this case, as they had been described by the Government:

> A government investigation established that Defendant engaged in conduct which the government alleges constitutes conspiracy to provide support to a foreign terrorist organization, among other crimes. The investigation included interviews with the four persons whose identification of Defendant is at issue here. At trial, the government plans to offer the testimony of these four witnesses who, it anticipates, will describe conduct of Defendant which will establish that he is guilty of the crimes charged. When interviewed, each of the four witnesses described the conduct of a man they each called 'Sharif.' Government agents then showed one photograph of Defendant to each witness and either implicitly or explicitly asked, 'Is this Sharif?'

(ECF No. 176 at 2.) The Court held that such procedures were "identification procedures." The Court held that a hearing was necessary to present the Court with sufficient evidence to make a determination as to whether the procedures where unduly suggestive, and if so, whether there was sufficient evidence of reliability under the totality of the circumstances, including the *Neil v. Biggers* factors.

During the hearing on May 23, 2012, it became clear that the identification procedures used were subtly different than what had been previously described to the Court. Each of the four witnesses was shown a series of multiple photographs. When each photograph was displayed, the agent asked, "Do you know this person?" If the answer was yes, the agent then asked, "What do you know about this person?" Each of the witnesses identified Defendant as "Sharif," at which point the photograph was left on the table while the agent and the witness discussed "Sharif." Witness

9

One and Witness Two each also participated in a later interview during which they were again shown Defendant's photograph in order to confirm that the person they were discussing named "Sharif" was the same person they had previously identified. Witness Three was also shown a photograph of Defendant while testifying before the grand jury. There is nothing in the record regarding what was said to Witness Three at that time regarding Defendant's photograph. Despite the fact that the government classifies Witness Three's statements before the grand jury as "testimony," rather than an identification, the Court cannot find that this display of Defendant's photograph to Witness Three was not an identification procedure without any information in the record regarding what was said before the grand jury.

The Court finds that these procedures are not so distinct from a traditional photo identification procedure as to remove them from the scope of caselaw governing admissibility of identification procedures. The government agents themselves seemed to consider this to be an identification procedure. Agent Beard testified that prior to showing Defendant's single photograph to Witness Four, she showed the witness 18 "six-packs," which she testified is how the FBI routinely conducts identification procedures. Agent Beard did not testify as to why Defendant's photograph was not included in a six-pack, other than to state that some single photographs were added to the end and that agents "hadn't made six-packs" for those photographs. These procedures were "identification procedures" and are subject to the traditional due process analysis requiring a determination of whether the procedures were unduly suggestive and whether the identifications were in any case reliable.

### 3. The single photo identification procedures were unduly suggestive.

The Court turns next to the question of whether the photo identification procedures were

unduly suggestive. The pretrial identifications in this case were single photograph identifications.[1] The Supreme Court has cautioned that use of a single-photograph display, as opposed to a photo array, increases the likelihood of incorrect identification. The Supreme Court noted that a witness is "apt to retain in his memory the image of the photograph rather than the person actually seen, reducing the trustworthiness of subsequent . . . courtroom identification." *Simmons v. United States*, 390 U.S. 377, 383-384 (1968); *Manson v. Brathwaite*, 432 U.S. 98, 117 (1977).

It is this concern for tainting the witnesses' memory that makes these photographic identifications unduly suggestive. Witnesses One, Two and Three all agreed to make identifications as part of cooperation agreements with the Government in exchange for leniency with regard to the criminal charges they were themselves facing. The four witnesses were each shown Defendant's photograph and asked to identify it. Because the Court denied Defendant's request to call Witnesses 1-4 to testify at the suppression hearing, the Court has only the agents' testimony to rely on that the witnesses identified Defendant as "Sharif" without hesitation or uncertainty. The witnesses then engaged in a conversation for several minutes about "Sharif" and his activities, all while Defendant's photograph was displayed on the table.

Witnesses One and Two both participated in two follow up interviews at which "Sharif" was

---

[1] The Government argues that these should not be viewed as single-photograph displays, but rather as photo spreads, ranging in size from two to 152 photographs, that just happened to be displayed one at a time. The Court does not find this argument persuasive. Agent VanDenover testified that when conducting a multiple photograph array, her procedure is to create a "six-pack" composed of the picture of the person of interest and five photographs of persons who look similar to the person of interest. Tr. 35. Agent Beard testified that she did multiple identifications using six-packs before showing Witness Four a single photograph of Defendant. The display of Defendant's photograph was not part of photo array. Rather, it was one in a series of single photograph identifications, each one displaying a single person of interest in the case.

again discussed while Defendant's photograph was displayed. During the interviews on November 15, 2011 and March 11, 2009, the witness discussed a man named "Sharif," at which point the agent placed Defendant's photograph on the table as if to ask, "Is this Sharif?" These repeated displays of Defendant's photograph served to dispel any hesitation the witnesses may have had in their original identification, and to firmly connect in the witnesses' minds the image of Defendant with the activities they attributed to "Sharif." The Court finds these procedures to be unduly suggestive and to have created a "substantial likelihood of misidentification."

The Government, relying on *United States v. Dobbs*, 449 F.3d 904, 910 (8th Cir. 2006), argues that the use of a single photograph was not unduly suggestive in this case because the witnesses had a prior relationship with Defendant. In *Dobbs*, investigators showed security camera footage of a robbery to three women, who then identified one or both defendants. The women who viewed the tape were the live-in girlfriend of one defendant, a woman who had known both defendants for twenty years and was the mother of one defendant's children, and a woman who also knew both defendants. *Id.* at 907. The Eighth Circuit held that an otherwise improper identification procedure is not unduly suggestive when the witness is a girlfriend, relative, or other acquaintance of the defendant. *Id.* at 910.

The Government's reliance on *Dobbs* is unavailing in this case, because the Government has produced no evidence that the witnesses had significant relationships with Defendant such as those that were present in *Dobbs*. The Government has steadfastly refused to offer such evidence. The only evidence in the record is that the witnesses stated they knew Defendant from the mosque, from an al-Shabaab safe-house in Marka, or both. No information was presented regarding the nature or duration of any relationship between the witnesses and Defendant. There is no way to tell from the

testimony offered by the Government whether these relationships are more like that between the individuals in *Dobbs*, or more like a classic identification scenario involving a witness to a crime. The Court finds that the photograph identification procedures utilized by the Government were unduly suggestive.

The Court also finds that these identification procedures were unnecessary. Agent Beard testified that she showed multiple "six-packs" during her interview with Witness Four. No agent testified that there was a reason Defendant's photograph could not have been displayed in a "six-pack." Because the Court finds that the identification procedures used were both unduly suggestive and unnecessary, the witnesses' in-court identifications will only be admissible if the totality of the circumstances show that the identifications were reliable.

### 4. The Government has failed to present evidence that the identifications are reliable despite the use of suggestive procedures.

At the hearing on May 8, 2012, the Government suggested that it would provide evidence of strong connections between Defendant and Witnesses 1-4. The Government indicated that the evidence would show that Witness One had known Defendant for 10 years; that Witness Two knew Defendant from the mosque and spent a week sharing a room with Defendant; that Witness Three knew Defendant from the mosque and had spent time in the same house as Defendant over a period of a week to ten days; and that Witness Four spent forty minutes to an hour in a car with Defendant. The Court terminated that hearing in order to allow the parties to brief the issue of whether the Government was required to identify the witnesses and whether Defendant had a right to call them at the suppression hearing.

The Court granted the Government's request to identify the witnesses by number, rather than by name. The Court then ordered the Government to present evidence at the reconvened hearing

13

on May 23, 2012 from the agent who interviewed each of the four witnesses regarding "what the witness told the agent regarding his or her ability to identify the Defendant and the facts and circumstances regarding the showing of Defendant's photograph." (ECF No. 76.) The Court allowed the Government to protect the identities of Witnesses 1-4, with the understanding that the Government would still provide sufficient evidence of the relationships between Witnesses 1-4 to allow the Court to make a determination of reliability.[2]

At the hearing on May 23, four agents testified in detail regarding the circumstances surrounding the showing of Defendant's photograph. The agents stated very little regarding what the witnesses told them about how they were able to identify Defendant as "Sharif" or about any prior relationship with "Sharif." The first agent to testify, Agent VanDenover, stated simply that Witness Two knew Defendant as an employee of Abubakr As-Saddique Mosque. In response to questioning from the Court, Agent VanDenover testified that Witness Two had shared a room with the defendant in Somalia.

Similarly, Agent Rielly testified that Witness One recognized Sharif as someone he knew

---

[2]The Government also proposed that the hearing on pretrial identifications be put off until a time shortly before trial when the Government would have revealed the identities of Witnesses 1-4. The Court denied that request. Ever since the Supreme Court's 1914 decision in *Weeks v. United States*, 232 U.S. 383 (1914) (holding that evidence obtained in violation of the 4th Amendment must be excluded in federal court), it has been the practice of the federal courts to hold a suppression hearing separate from and prior to trial. Indeed, it was the "seasonable application" for the return of his illegally seized papers that distinguished Fremont Weeks' case from prior Supreme Court cases which had held, "That the Court, when engaged in the trial of a criminal action, will not take notice of the manner in which a witness has possessed himself of papers or other chattels, subjects of evidence, which are material and properly offered in evidence." *Id.* at 345. The practice of holding a pretrial suppression hearing allows the defendant to challenge the admissibility of evidence offered by the government without interrupting the trial itself with a series of mini trials on collateral issues, so that the Defendant knows what evidence he must confront at trial.

from Abubakr As-Saddique Mosque and from the safe-house in Somalia. When the Court asked Agent Rielly whether Witness One ever said anything else about how well or how long he knew Sharif or Defendant, the Government objected to that line of questioning. The Government then explained that they were "deliberately underproving" their case by choosing not to present any evidence of the nature of the relationship between Witnesses 1-4 and Defendant. The Government stated that providing testimony regarding the nature of those relationships would risk revealing the identities of their witnesses. The Court sustained the Government's objection, but warned that this hearing was the Government's opportunity to present evidence regarding the reliability of identifications and that the Court would make it's decision based on the evidence presented. Tr. 93, 130. The Court then sustained the Government's objections to all questions on cross-examination regarding the relationship between Witnesses Two, Three and Four and Defendant.

During the remainder of the hearing, virtually no evidence was presented regarding how Witnesses Three and Four were able to identify the photograph of Defendant as "Sharif." Agent Zimmerman testified that Witness Three stated the Defendant was "present with him in Somalia." Tr. 105. Agent Beard testified that Witness Four indicated that the Defendant worked as a janitor at Abubakr Mosque. Tr. 125.

The Court cannot make a determination of reliability based on evidence that the Government hints that it possesses but has chosen not to produce. While the Government has provided testimony as to where the witnesses stated they had seen the man they identified as "Sharif," the Government did not provide any evidence of the nature or duration of relationships between the witnesses and Defendant. The Government did not provide evidence of how much time the witnesses had spent with Defendant or their opportunity to view Defendant. In the absence of evidence establishing the

reliability of these identifications, the Court finds that the suggestive identification procedures utilized in this case give rise to a serious likelihood of irreparable misidentification. The Court therefore recommends that the in-court identifications of Defendant by Witnesses 1-4 be suppressed.

**B.      Voice Identifications.**

Defendant also moves for the suppression of any in-court voice identifications. At the hearing on May 8, 2012, defense counsel inquired as to whether there were any "voice identifications" in this case. The Court ordered the Government to disclose by May 11, 2012 whether anyone identified Defendant's voice on tape-recorded, intercepted communications. In its memorandum filed on May 11, 2012, the Government stated:

> If by 'voice identification' the defense refers to a procedure where an expert listens to a tape and to a known voice, compares the two, and is prepared to testify that the two are the same, then the answer is that there are no voice identifications in this case. But if the defense means by 'voice identification' lay testimony that a witness knew who he was talking to on the telephone, then the government will seek to introduce such evidence at trial.

(ECF No. 171 at 10.) The Government presented no evidence regarding voice identifications at the hearing on May 23, 2012. In its memorandum in opposition to Defendant's motion to suppress, the Government states, "No trial witness has been asked by any law enforcement officer or prosecutor to listen to the defendant's voice (live or recorded) and then state whether they do or do not recognize that voice." (ECF No. 190 at 7.)

Defendant argues that any identification of Defendant's recorded voice at trial by a lay witness should be suppressed, as the Government has refused to provide any information regarding pretrial voice identifications. Defendant argues that to allow such an identification for the first time at trial would be unduly suggestive.

To the extent the Government asks a witness at trial to identify Defendant's voice on a

16

recording based solely on the witness's familiarity with Defendant's voice, that would constitute a "voice identification" subject to pretrial due process analysis. Because the Government did not offer any evidence regarding voice identifications at the pretrial suppression hearing, the Court recommends that any voice identification offered for the first time at trial should be suppressed. Defendant's motion to suppress voice identifications should be granted.

To the extent the Government elicits testimony at trial that a witness engaged in a phone conversation with Defendant and that the witness remembers to whom he was speaking during that conversation, that does not constitute a "voice identification" requiring a pretrial suppression hearing. The Court's recommendation that voice identifications at trial be suppressed does not apply to such testimony.

## III. RECOMMENDATION

Based upon the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Identification Evidence (ECF No. 119) be **GRANTED** as follows:

1. To the extent Defendant seeks to suppress any in-court identifications of Defendant by Witnesses 1-4, the motion be **GRANTED**.

2. To the extent Defendant seeks to suppress any in-court voice identification of Defendant, the motion be **GRANTED**.

DATED: July 19, 2012            *s/ Franklin L. Noel*
                                                   FRANKLIN L. NOEL
                                                   United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **August 2, 2012**, written objections which

specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **August 2, 2012,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.